UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL NO. 1-23-cr-404 (JEB) |
| | : | |
| JOSHUA PARMENTER | : | |
| | : | |
| _____ | : | |

## DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Joshua Parmenter, through undersigned counsel, submits this sentencing memorandum to aid the Court at sentencing. Mr Parmenter pleaded guilty to one count each of Disorderly Conduct in a Capitol Building or Grounds Parading in violation of 40 U.S.C. §5104(e)(2)(D), and Demonstrating or Picketing in a Capitol Building in violation of 40 U.S.C. §5104(e)(2)(G). Based on the facts and arguments below, Mr Parmenter requests the Court sentence him to a period of supervision to include community service; supervision to convert to unsupervised upon completion of community service. We submit that this sentence would most accurately address the concerns of the sentencing statute, 18 U.S.C. §3553.

As is our practice, we are not going to belabor the Court with a recitation of the information contained in the Presentence Report. Rather we will contain our remarks to factors we feel pertinent and relevant to the Court's sentencing calculus outside of that document, focusing on Mr Parmenter's actions and memories of the events of 6 January 2021, and perspective on his position over three years later.

**Prologue to 6th January.**

Joshua Parmenter was a supporter of former President Trump. He'd believed in him back in 2016 and felt as the 2020 election loomed Trump had earned his vote again for another term in

office. The events of the latter part of 2020 took a very strange undertone though. In the period leading up to the election, perhaps reading the political tea-leaves, the former president claimed were he to lose this election, this could only happen if election fraud were to have taken place. This meme was bombarded across right-wing media.

A sad indictment of our times is media outlets have become increasingly polarized and seek not to *inform* their respective audiences, rather cater to the already-apparent biases of their target demographic. In response, it is natural for the audience, hearing what they want to hear, to become increasingly fervent having their particular suspicions and fears buttressed. No one likes to lose, and reassuring any crowd that *if we lose its because we were cheated* is an incredibly powerful narcotic, and this message struck a resonant chord with Trump's faithful. As the first Tuesday in November approached, the message of potential voter-fraud to the devoted increased to frenetic levels: The scene was set for discord. Trump constantly stoked the fires claiming there was an organized effort from his adversaries to "steal" the election. This was nuclearized with the message that the conservative vote as a whole was being neutralized. Again, the message resonated. Moreover. in addition to the media, the circles and friends one encounters also has a strengthening factor to personal beliefs or fears. All this combined, and on the eve of the election the stage was set; the powder was primed.

3rd November arrived. The country watched with bated breath as Americans went to the polls.  Tuesday evening turned into Wednesday; the nation perched on the edge of its seat as the election leaned towards Biden. The right-wing media went into overdrive. It didn't help that recount after recount left us 4 days without a decision: It would take until Saturday for the result to be called. The effect of this four-day delay only served to ramp-up the tensions and fears as the faithful watched what appeared to be Trump's prediction coming to pass. In the wake of the result, an explosion of frenzy followed with court cases, recounts, protests of cheating screamed from the

PeterCooperLaw

rooftops. The new meme of "Stop the Steal" took to the airwaves. But as court case after court case collapsed, as recount after recount confirmed the returns, and as state after state refused to nullify their results, the options for the faithful dwindled. 6th January 2021 was the scheduled date for Congress to exercise its two-hundred-year-old constitutional duty in certifying the votes of the Electoral College, and this date quickly became the new focal point. Trump called for a huge rally for that day, and the MAGA hats responded.

**6th January, 2022**

As the day approached, Joshua Parmenter considered the situation. He had observed the last eight weeks frenzy and outrage from the outlets. He had discussed the events with close friends, relatives, and contemporaries. Joshua relates that he was not unfamiliar with the spectre of voter fraud and was very much sangfroid on the subject. Nonetheless, as mentioned, over the course of Trump's presidency Joshua had viewed him to be a good man and a president worthy of the office. He was aware of the upcoming rally and as he had not actually seen the former president in the flesh, decided it would be a good idea to travel to Washington DC to attend this last rally: To see and hear the outgoing president. Joshua left for what he hoped would be an experience to remember. He had no inkling it would indeed be a once-in-a-lifetime experience, but for *very* different reasons.

Joshua arrived in the DC area on the morning of the 6th.  However, he had misjudged the times of the rally and by the time he arrived, the event was over.  He was confronted though with the mass of people making their way to the Capitol. People were everywhere. The mood was light but energetic. On the way down Constitution, Joshua remembers starting to see an increased police presence. As he neared the Capitol grounds, approaching at the North-West corner, he noticed loud booms and smoke off towards the south end. He was unaware what was happening at that location but as it seemed far off he was unconcerned. The crowd approached the building and he found

3

himself up on the west terrace outside of the already open Senate Wing doors. The mood was still upbeat—People packed together like sardines. The crowd moved forward and up the steps singing patriotic songs. He describes the feeling now that this was historic. This was an event happening before his eyes. He was overcome with emotion. And this was the moment. This was instant when Joshua's life changed forever.

At the top of the steps leading to the doors the crowd was cheering. The crowd entered and he followed. He remembers everything being a bit of a blur. One minute he was outside on the steps, the next he was inside. To his day, he is uncertain how that happened.

Before moving on, Joshua Parmenter would like to be clear about the idea of being carried along. He had not fostered any preconceived intent to enter the Capitol that day. However, the nature of the situation was not one that encouraged thoughtful reflection. Additionally, the actions of the police at that entry point did not seem to be taking any active steps to prevent entry. This claim of the police letting rioters in building that day has been spread by many. On being exposed to significant materials in these matters, this has always troubled counsel knowing the efforts of the police on that day, and how these two conflicting versions can coexist in the same universe. In a different January 6 trial, counsel heard the testimony of officers who were stationed at an entry point. The sergeant testified that there was only himself and four other officers. The numbers of protesters streaming in made it physically impossible to prevent entry. He was not going to order his men to do anything that endangered them physically. So, they stood to the side and limited their actions to attempting to verbally encourage peaceful respect for the building. This is borne-out by video footage. Nonetheless, it is clear how the protesters misread lack of police action in certain places and how to some extent there still exists the feeling amongst the Trump faithful that they were let in. The upshot of this for Joshua is despite the events of the day constituting a breach of security, the time and place of his entry was free of the violence seen in other areas. He was

PeterCooperLaw

swept in. As people went into the building, he went along. He recognizes and accepts responsibility for these decisions, but remains of the belief that there was no malicious intent on his part, nor of anyone around him to discern.

Now in the building, Joshua was a little lost. He made his way in the general direction of what we now know to be the Crypt. It didn't take long though for him to realize his presence in the building was a big mistake. He stopped, turned one hundred and eighty degrees, and headed out the way he'd entered. He had been in the building three minutes. Once outside he decided enough was enough, and made his way back to where he believed he'd left his car. On the way home, listening to reports coming in, Joshua became aware of what had transpired at other locations in and around the building, and hearing reports of what had taken place, the gravity of what had transpired set in, and the feeling that things would never be the same again was inescapable.

**The Present Day.**

Joshua Parmenter looks back at the events of 6th January 2021 with regret. He feels regret from several angles. First, he expresses remorse for his actions that day. In going to the Capitol, he had no intent to engage in any of the behavior that rose to the level we all experienced. The environment he found himself in was animated and he found herself being swept along, both emotionally in the mentality of the mob and physically in the manner in which he found herself in the Capitol building itself. As we have mentioned, that is not to say that he was forced in against his will but rather the frenzy left little time for self-reflection: the self-reflection he quickly came to and which he still employs. He looks back now and understands the gravity of being inside the building; what it meant. It brings home that this went way beyond any initial intent. It is the trigger of why he knew he needed to get out as quick as he could. He wishes he'd encountered that epiphany before things got out of hand. He knows that despite a lack of any underlying

PeterCooperLaw

malevolence, or any thought to alter the election, or even to *fight like hell*, his actions crossed a line, and he accepts responsibility for this.

Secondly, he feels sadness at the manner that the day and its participants are now perceived. He came to DC with the honorable intent of displaying his support for the outgoing president and hearing him speak one last time. But the nature of the violence the nation witnessed has cast a pall over anyone who attended that day, and that is something he describes as "horrible," and a "nightmare." He has spent a lifetime developing his good character but now he is simply known as Joshua Parmenter, J6er. His reputation is destroyed. He feels he cannot go anywhere without the notoriety of involvement in that day following him. He has been approached on several occasions by media to provide his side of events, but has declined to do so out of shame. Being a man of faith, he is fully aware of the act of contrition being an indelible stop on the path to redemption. He realizes it is a sentencing he faces, but he also sees it as the first step on his path and while he views the hearing with trepidation, he also sees it as a cathartic moment in his journey forward and wishes to make plain to the Court that he knows he's here based on his own actions and takes responsibility.

**Sentencing Factors.**

18 U.S.C. §3553 provides:

**(a) Factors To Be Considered in Imposing a Sentence.**—The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider—

    **(1)** the nature and circumstances of the offense and the history and characteristics of the defendant;

    **(2)** the need for the sentence imposed—

        **(A)** to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

        **(B)** to afford adequate deterrence to criminal conduct;

        **(C)** to protect the public from further crimes of the defendant; and

PeterCooperLaw

6

**(D)** to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

Addressing these factors individually we find the following. Nature and circumstances of the offense with respect to this offense is a highly combustible issue, and we will return to it later. On history and characteristics of the defendant there is not much debate. Joshua Parmenter has no criminal history; indeed this is his first encounter with the criminal justice system. His background displays an individual who has not only led a completely law-abiding existence prior to the events bringing him here, but one portraying a husband and father of three daughters who runs his own business. Subsection (2)(A) discusses seriousness of the offense, respect for the law, and just punishment for the offense. We will return to this also when we discuss nature and circumstances of the offense. Subsection (B) contemplates adequate deterrence to criminal conduct. He has been emotionally shaken by these experiences with the justice system, and the insight he has acquired has left him with the strongest of convictions that this will be his last. Incarceration is not necessary to make that point. Subsection (C) considers a similar idea as that in (B), in protecting the community from further criminal contact. Here we point out Joshua Parmenter is *literally* as far from being a career offender as is possible and, again, given his experiences here, the public has nothing to fear from him in the future. As a final comment on Subsections (B) and (C), the events of January 6 constitute Mr Parmenter's first and only foray into mass political events. He has been scarred by this and has vowed to stay as far away from such happenings as possible. With respect to his views on the ex-president, Mr Parmenter maintains that Mr Trump will now have to get by without Joshua's presence at any rally. Regarding Subsection (D), quite simply Mr Parmenter has no need of any of the services available to U.S. Probation. Which brings us back to sections (1) and (2)(A).

Returning to the nature and circumstances of the offense we find in these matters this is a not a simple issue to unpack. On the one hand, the specific conduct and decisions Joshua accepts responsibility for, in the universe of criminal conduct, are not the most egregious considered by these courts. However, taken into context with the much larger events of 6 January, the nature and circumstances question becomes much less clear. There is no question the events of that day have left a deep scar on the national psyche. Seditionary behavior has in some cases been charged and convicted. But we ask the Court to take note that Mr Parmenter is one of a small group of people who despite having gone down the regrettable road of entering the Capitol realized it was not the place to linger and got out as quickly as possible. We ask the Court to recognize that even at what appeared to be the point of no return, this was a Rubicon he knew had to be recrossed. We ask the Court to view his actions against the backdrop of those with more sinister intentions as proof of his original harmless purpose and sentence him accordingly.

Addressing (2)(A), we have already discussed Mr Parmenter's view of the events of that day being contrary to the best interests of the country, but he also views those acts as not being true to his core values of respect towards law and order. We highlight to the Court that he has never been associated with any organisation encouraging civil disobedience, advocated overthrow of the government, displaying extremist right-wing views, or has encouraged in any way violence of the nature apparent on 6th January. In terms of any sense of danger to the community, there is simply non: it does not exist. The Court should have no concerns as to his views on the respect for law either today or for the future.

The final issue §3553 to be discussed is the last part of (2)(A): just punishment for the offense. Obviously, this is the very central issue for this Memorandum as a whole. Mr Parmenter is a law-abiding citizen, who placed himself in the wrong place at the wrong time. He came to DC to attend a political rally, and quickly found himself in the middle of an escalating situation in

PeterCooperLaw

8

which speech, free or not, was being dropped as a form of expression by a mob, spinning out of control, where rage was taking over. He has been shattered at the fallout from that day. His life will never be the same again. This, in and of itself, is more than adequate punishment. In no way, shape or form should the Court be under the impression that a departure sentence would be seen as getting away with anything. For the rest of her life Joshua will forever be associated with the events of that day, and he takes this to heart.   Given all discussed above, including the fact of his decision to disengage when he did, we ask the Court to sentence in accordance with our proposal.

**Need to avoid sentencing disparities.**

A word on sentencing disparities and the need to avoid. The essential problem here is the spectrum to which these defendant's belong is vast and by nature, disparate. In these cases it is entirely appropriate to sentence one participant to over incarceration while effectively placing another on probation, and while those two sentences would appear to be disparate based on the charges, they may not when viewed in terms of the individuals involved. The trick then is to tailor a sentence to the subject before the Court. We ask the Court not to sentence Mr Parmenter based on the circumstances of others, but to focus on him and his participation here and sentence accordingly.

**Conclusion**

Taking all the above into account. We ask the Court to provide the following sentence. We submit the community would not be benefitted by any period of incarceration, but would benefit by a period of supervision to include community service; supervision to convert to unsupervised upon completion of community service. We believe the community would benefit far more from this service than any incarceration. We believe this sentence to best satisfy the above concerns of 18 U.S.C. §3553.

/s/  *Peter A. Cooper*

Peter Cooper; 478-082
Counsel for Joshua Parmenter
400 5th Street NW.
Washington DC 20001